TODD R. GREGORIAN (CSB No. 236096)
*tgregorian@fenwick.com*
GARNER KROPP (CSB 312585)
*gkropp@fenwick.com*
GREGORY ADAMS (CSB 292391)
*gadams@fenwick.com*
FENWICK & WEST LLP
One Front Street, 33rd Floor
San Francisco, CA  94111
Telephone:     415.875.2300
Facsimile:     415.281.1350

*Counsel for Plaintiff*
TRUE FOOTAGE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRUE FOOTAGE INC.<br><br>       Plaintiff,<br><br>       v.<br><br>AUTOMAX AI INC.; AUTOMAX AI (US) INC.; and HUMZA AHMED,<br><br>       Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br>**1.  FRAUD**<br>**2.  NEGLIGENT MISREPRESENTATION**<br>**3.  BREACH OF CONTRACT**<br>**4.  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>**5.  INDUCING BREACH OF CONTRACT**<br>**6.  DIRECT COPYRIGHT INFRINGEMENT**<br>**7.  CONTRIBUTORY COPYRIGHT INFRINGEMENT**<br>**8.  VICARIOUS COPYRIGHT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

FENWICK & WEST LLP

COMPLAINT                                                                                          CASE NO.

Plaintiff True Footage Inc. brings this action against Defendants Automax AI Inc., Automax AI (US) Inc., and Humza Ahmed and alleges as follows:

**NATURE OF THE ACTION**

1. This is a case about a college student so desperate to participate in Silicon Valley's startup culture that he would defraud a market leading company to get access to and copy its product and then attempt to pass that copy off to investors as his own work.

2. Plaintiff True Footage Inc. is the market leader in data-driven real estate appraisal software. Since its founding in 2021, True Footage has brought efficiency and objectivity to appraisals with an end-to-end workflow of sophisticated property market analysis. One of True Footage's products is TrueTracts, an all-in-one tool that collects the most important data for accurate appraisals, analyzes it using statistical models not used previously in the industry, and presents the results in an easily digestible format for appraisers. True Footage's engineers spent years developing the technologies and features that make TrueTracts the most accurate and user-friendly appraisal tool on the market.

3. Defendant Humza Ahmed is a 21-year-old former student of the University of Waterloo in Ontario, Canada. While in school, he began work on "Automax AI," an appraisal software startup that in its early days appears to have focused on training commercially available Large Language Model (LLM) software to look up data and populate the forms necessary to complete a residential real estate appraisal.

4. Ahmed left college and moved to San Francisco in 2025 to work on Automax. He raised some seed money, began socializing with founders of technology startups, and eventually applied to the Fall 2025 series at Y Combinator—a well-known startup accelerator that over the years has invested in some of Silicon Valley's biggest names. Each "batch" of Y Combinator participants lives in San Francisco for three months of intensive work on their startups, culminating in pitches to an audience of potential investors.

5. Ahmed's acceptance into Y Combinator placed him under intense pressure to show that Automax had sufficient promise to draw investment from established venture capital firms. He immediately began seeking a shortcut to success and settled on a plan to copy TrueTracts. Indeed,

FENWICK & WEST LLP

the same month his Y Combinator program session began, Ahmed provided false information to True Footage to gain access to TrueTracts, misrepresenting himself as a licensed appraiser and member of the MLS. He then shared his account credentials with other Automax employees, including a software developer in Norway, who quickly began copying every aspect of TrueTracts they could access into an Automax product dubbed "Copilot." When they hit barriers to access certain features, Ahmed and Automax induced several legitimate True Footage customers to misuse their True Footage accounts to help copy those features, too. What resulted was a rote copy of TrueTracts that Ahmed mislabeled "Copilot" and misrepresented as his own work to secure several million dollars in investment at the end of the program.

6. True Footage brings this action to stop the Defendants' unlawful conduct and to protect True Footage's intellectual property, its reputation, and its customer relationships from further harm.

## THE PARTIES

7. Plaintiff True Footage Inc. is a corporation organized on April 8, 2019 under the laws of Delaware, with a principal place of business in Austin, Texas.

8. Defendant Automax AI Inc. is a corporation organized on July 5, 2023 under the laws of Ontario, Canada. On information and belief, Automax AI Inc.'s principal place of business is in San Francisco, California.

9. Defendant Automax AI (US) Inc. is a corporation organized on February 20, 2025 under the laws of Delaware. On information and belief, Automax AI (US) Inc.'s principal place of business is in San Francisco, California.

10. Defendant Humza Ahmed is the founder and Chief Executive Officer of Automax AI Inc. and Automax AI (US) Inc. He is a resident of San Francisco, California.

11. On information and belief, Defendants Automax AI Inc. and Automax AI (US) Inc. (collectively "Automax") have at all relevant times been under the common ownership, dominion, and control of Defendant Humza Ahmed, and operated together as a single business enterprise.

12. On information and belief, the two Automax entities share the same officers, principal place of business, branding, website, and product, and commingle assets, employees, and

FENWICK & WEST LLP

funds without respecting corporate separateness. The two entities hold themselves out to the public simply as "Automax AI," without distinction between them.

13. As such, observance of any corporate formalities between the two Automax entities would sanction fraud or promote injustice because both entities collaborated in the wrongful acts alleged in this Complaint and jointly benefited from those acts. Each entity is the alter ego, agent, or instrumentality of the other, and the actions of one are legally attributable to both.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because True Footage asserts claims under the Copyright Act, 17 U.S.C. § 101 *et seq*. The Court has supplemental jurisdiction over True Footage's remaining claims under 28 U.S.C. § 1367 because such claims are so related to True Footage's Copyright Act claim that they form part of the same case or controversy under Article III of the United States Constitution.

15. The Court has personal jurisdiction over Automax because Automax maintains its principal place of business in this District, regularly transacts business in this District through its website and commercial operations directed at users located in this District and throughout California, and because Automax committed the acts giving rise to this Complaint within this District. Automax participated in the Y Combinator startup accelerator in this District, conducted appraisals of real estate located in this District, and provides Automax's product to appraisers conducting appraisals in this District.

16. The Court has personal jurisdiction over Ahmed because he resides in this District, regularly transacts business here, and committed acts giving rise to this Complaint within this District and throughout California. Ahmed participated in the Y Combinator startup accelerator in this District to develop the infringing product, illicitly used True Footage's products to view real estate located in this District, illicitly used True Footage's products while present in this District, and conducted appraisals of real estate located in this District using Automax's infringing products.

17. Defendants expressly aimed their wrongful conduct at True Footage and caused injury that Defendants knew or should have known would be felt in this District.

18. Venue is proper in this District under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a)

COMPLAINT                                   3                                   CASE NO.

because Automax resides in this District and conducts business from its principal office in San Francisco, California; Ahmed resides in this District; and a substantial part of the events and omissions giving rise to the claims occurred in this District, including Ahmed's registration for True Footage accounts, Defendants' access to True Footage's products, and Defendants' appraisals of real estate in this District using their illicit product.

## DIVISIONAL ASSIGNMENT

19.    Events giving rise to this action occurred in San Francisco County. Ahmed breached his contract with True Footage while located in San Francisco. Defendants created Automax's infringing product in San Francisco and used Automax's infringing product to create appraisals of real property in San Francisco.

## BACKGROUND

### True Footage innovates real estate appraisal systems.

20.    True Footage was founded in 2021, and it has become a leader in appraisal software through innovative tools like its TrueTracts product.

21.    True Footage addresses long-standing inefficiencies and data gaps in the residential real estate appraisal process. Traditional appraisals are subjective, manual, and time-consuming—limitations that slow loan origination and increase costs. Lenders, appraisers, buyers, and sellers all benefit from faster turn times and objective appraisals.

22.    True Footage solves these problems with a data-driven appraisal platform. True Footage's products, like TrueTracts, identify and present the most relevant property and market data so appraisers can produce more consistent reports in less time.

23.    A key to the success of TrueTracts is the selection, arrangement, and organization of data and visual elements throughout an appraiser's workflow. Identifying comparable properties is challenging because properties can vary across hundreds of dimensions, including both objective factors (like the number of bedrooms) and subjective factors (like the perceived quality of construction materials). An appraiser must decide which factors to consider and how to incorporate them to arrive at a single estimate of value for the property. An appraisal thus requires hundreds of decisions influenced by data.

FENWICK & WEST LLP

24.    TrueTracts simplifies these decisions.  For example, one common problem in appraisals is that there are not enough sales in the immediate vicinity of a subject property to build accurate models of the housing market, and the appraiser must then make poor guesses from dissimilar properties.  TrueTracts is the first appraisal tool to solve this problem with a dynamic heatmap, which identifies comparable properties outside of the neighborhood.

25.    To build the heatmap, TrueTracts first uses features like construction year, lot size, and number of bedrooms to estimate sale prices for properties with similar features in the general area of a subject property.  TrueTracts then displays a heatmap comparing the difference of each estimated sale price to the actual sale price.  The screenshot below shows a sample heatmap.  Each black dot is a property with similar features.  The dark green areas have very similar actual sales prices and estimated sales prices.  This tells the appraiser that the locations of those neighborhoods have a similar value as the location of the subject property.  The light green areas have a somewhat similar actual and estimated sales price, showing that the location of those neighborhoods have a somewhat less similar value as the location of the subject property.  The blue areas reflect lower actual sales prices, showing less valuable locations.  And the red areas reflect higher actual sales prices compared to estimated sales prices, showing more valuable locations.

*True Footage TrueTracts Heatmap Page*



26.     An appraiser without TrueTracts might have looked only at a handful of nearby sales and used imprecise comparisons to figure out how much the subject property is worth.  TrueTracts quickly shows the appraiser hundreds of similar properties across the area, leading to better comparisons and more accurate estimates.  TrueTracts lets the appraiser make better data decisions in seconds.

27.     TrueTracts includes other innovative features described in more detail below, including an adjustment feature that replaces linear assumptions about the value of certain property features with a more realistic and accurate nonlinear model that incorporates larger data sets.  TrueTracts also includes a reconciliation dashboard that shows the property's final range of values.

28.     By integrating these intelligent data insights directly into the appraisal process, True Footage improves efficiency, reduces errors, and modernizes appraisals across the residential mortgage industry.

29.     True Footage copyrighted its innovative platform, registering the computer code that operates the back-end data management and logic of TrueTracts (Registration TXu 2-537-302), the computer code that presents the front-end user interface of TrueTracts (Registration TX 9-585-370), and the white paper describing True Footage's methods used in TrueTracts (Registration TX 9-581-457).  Copies of the registration certificates for the True Footage copyrights are attached as Exhibits A–C.  The registrations for these copyrights are in full force and effect and constitute prima facie evidence of True Footage's ownership and exclusive rights in the works.

30.     True Footage earns money from lenders and from appraisers.  To lenders, True Footage sells appraisals that appraisers created using True Footage products.  To appraisers, True Footage sells subscriptions to use True Footage's products, including TrueTracts.

**Ahmed obtains access to True Footage's platform by misrepresenting his identity and providing other false information about his intended use of the products.**

31.     Humza Ahmed is a former student of the University of Waterloo in Ontario, Canada.  As a student, he began developing Automax, using commercially available LLM software to

automate appraisers' routine data entry tasks.[1]

32.    Ahmed dropped out of school and moved to San Francisco to focus on Automax.  In the spring and summer of 2025, he solicited seed funding from venture funds and startup incubators including Afore Capital, and pitched Automax to other investors.

33.    Automax was accepted into Y Combinator's Fall 2025 startup accelerator program beginning in October 2025.  Y Combinator is a renowned program that fuels the development of startups, and its alumni include some of the most successful businesses in Silicon Valley, like OpenAI, AirBnB, DoorDash, and Reddit.  Startup founders accepted to the Y Combinator program are required to move to San Francisco for three months of intensive work alongside the other members of their "batch."[2]  Y Combinator invests $500,000 in each startup, and the three-month program culminates in each startup pitching an audience of investors on Demo Day.[3]

34.    Just days into the Y Combinator program, under building pressure to show continued progress and solicit investment for Automax, Ahmed turned to copying True Footage's competing product rather than develop his own.

35.    Ahmed created a True Footage account on October 29, 2025 in his own name and signed up the next day for TrueTracts and separately signed up for another True Footage product called "Spark."[4]

36.    Each appraiser who creates an account with True Footage and uses TrueTracts or Spark must represent that he is an active Multiple Listing Service (MLS) member and agree to the governing terms of service.  TrueTracts and Spark each has its own terms of service that a user must agree to when signing up for the product.[5]

37.    The TrueTracts and Spark terms of service are, collectively, the "Product Terms of Service" and have substantially similar material terms.  Among other provisions, the Product Terms

---

[1] "Mixing family and business: Student founder optimistic about future of productivity," April 12, 2024, https://www.velocityincubator.com/news/mixing-family-and-business-student-founder-optimistic-about-future-of-productivity.
[2] "What Happens at YC," https://www.ycombinator.com/about.
[3] *Id.*
[4] "Spark for Appraisers," https://www.truefootage.tech/tools/spark.
[5] "TrueTracts Terms of Service," https://www.truefootage.tech/tools/truetracts/terms-of-service; "Spark Terms of Service," https://www.truefootage.tech/tools/spark/terms-of-service.

FENWICK & WEST LLP

of Service require:

   (a)   that the user use the account only as an individual and will not share the account.[6]

   (b)   that the user register with accurate information.[7]

   (c)   that the user use the product "solely for its intended purpose as a tool for appraisers" and not for any unlawful purpose.[8]

   (d)   that the user use True Footage's intellectual property in the product solely for the user's own internal business purposes.[9]

38.   Ahmed knowingly misrepresented to True Footage that each of these facts was true and that he would abide by them.

39.   Based on True Footage's investigation, Ahmed is not a licensed realtor or appraiser and cannot be a member of any MLS.  Yet when he created his account, he stated falsely that he is—claiming membership in six different MLS services in the San Francisco Bay Area: MLSListings, Bareis MLS, Bareis Plus, bridgeMLS, Bay East Association of Realtors, and San Francisco MLS.

40.   But for his misrepresentations, Ahmed would never have been able to access TrueTracts, Spark, or any True Footage product.  True Footage relied on such misrepresentations, as well as the other promises he made to abide by the Product Terms of Service, in granting him access.

41.   Over the next five months, Ahmed shared his True Footage account with others at Automax including Sindri Mørch Tomasson, who used the True Footage account from an IP address in Trondheim, Norway.  Together Ahmed and these individuals started 18 different property estimates, called "sessions."  They used these sessions not to conduct appraisals for any pending real estate transaction, but to copy TrueTracts into Automax's appraisal product.

---

[6] TrueTracts Terms of Service § 2.1; Spark Terms of Service § 2.1
[7] TrueTracts Terms of Service § 2.3; Spark Terms fiof Service § 2.3.
[8] TrueTracts Terms of Service §§ 4.1–4.2; Spark Terms of Service §§ 4.1–4.2.
[9] TrueTracts Terms of Service § 5; Spark Terms of Service § 5.

COMPLAINT                                      8                                      CASE NO.

FENWICK & WEST LLP

42. Activity on Ahmed's account does not show an appraiser making estimates in the normal course of an appraisal business. One of the sessions in Ahmed's account was for the same property that True Footage personnel had used for product demonstration and training purposes in public webinars. Defendants also created multiple sessions for the same properties (including 10117 Rio Hondo Parkway in El Monte, California and 574 Chenery Street in San Francisco, California) as well as sessions for properties in Florida, Illinois, Massachusetts, and Nevada, where Ahmed did not even claim to have MLS membership when registering his account.

43. The creation of multiple sessions is particularly telling. Any legitimate appraiser developing an estimate of 10117 Rio Hondo Parkway, for example, would create a single session and adjust the parameters of the appraisal within that session as needed. There is no need to create multiple sessions for the same property. Here Defendants created up to five TrueTracts sessions for a single property to infer how TrueTracts worked and copy the result.

**Ahmed induces True Footage customers to breach their agreements so he can gain access to and copy additional features of TrueTracts.**

44. Not only did Ahmed breach his own agreements with True Footage, but Defendants induced appraisers to breach their own agreements with True Footage so that Defendants could more easily access and copy additional TrueTracts features.

45. Certain TrueTracts features, including the portions of TrueTracts that display adjustment and reconciliation functions, are accessible only after a user identifies comparable properties and inputs enough data about them. Although a user can input public property data manually, licensed appraisers who sign up for True Footage's Spark product can import MLS data files and gain access to those features with richer data. Because Ahmed is not a member of any MLS, he could not upload any MLS data to access those features.

46. To circumvent those restrictions, Defendants contacted licensed appraisers who possessed valid MLS credentials who then created their own TrueTracts sessions at the same property addresses Defendants accessed, including 10117 Rio Hondo Parkway in El Monte, California, and 553 94th Avenue North in Naples, Florida. True Footage's records show that those outside appraisers created sessions for identical addresses within days of Defendants' own sessions.

47. One cooperating appraiser, located in the San Francisco Bay Area, created a session for the Rio Hondo Parkway property in Los Angeles County—which is outside the appraiser's MLS market area—right after Automax created a session for the same address. The appraiser used his MLS access to download comparable sales data and upload that data into the TrueTracts interface, thereby activating the adjustment and reconciliation tabs for the property. By doing so, the appraiser gained access to elements of TrueTracts that Defendants had not reached in their own property session.

48. Defendants then obtained the session link generated by the cooperating appraiser. A TrueTracts session link permits any TrueTracts user in possession of the link to open the session and view or edit the data and screens contained within it. By using those links, Defendants could view and manipulate the portions of TrueTracts previously locked to them, including adjustment graphs, statistical commentary, and reconciliation dashboards.

49. In using True Footage accounts to develop Automax's products, Defendants thus, with knowledge that they were doing so, caused or induced additional breaches by these appraisers who acted in concert with Defendants.

**Ahmed and Automax use commercial AI tools to create a rote copy of TrueTracts.**

50. On information and belief, Defendants used one or more commercially available artificial intelligence tools to copy TrueTracts and reproduce its features and front-end code. Popular generative AI tools operate by ingesting the materials supplied to the tool in a user's prompt, analyzing those inputs with the tool's pre-trained model, and generating the output requested by the user's prompt. Anyone can provide these AI tools with an existing website's screens, sequences, commands, or explanatory text, and through a process known as "vibe coding," can command the tool to generate new code and visual assets that reproduce the look and feel, structure, and language of those inputs. Consumers—even those without significant software development experience—can now create duplicates or near-duplicates of existing multimedia in seconds using commercially available generative AI tools.

51. On information and belief, Ahmed entered components from TrueTracts into one or more generative AI tools to prompt the generation of code, text, and visual assets for Copilot.

COMPLAINT                                              10                                              CASE NO.

FENWICK & WEST LLP

TrueTracts operates as a browser-based application. When a registered user logs into a TrueTracts account, the web browser automatically downloads JavaScript, cascading-style-sheet (CSS) files, and other front-end resources needed to display the application. Those files and embedded scripts are visible and can be saved or inspected through common browser tools. On information and belief, Defendants accessed and examined these front-end components while logged into TrueTracts, captured or exported portions of TrueTracts's code and associated design elements, and used them to guide generative AI tools to reproduce them as part of the Automax Copilot interface. This process allowed Defendants to analyze and manipulate TrueTracts's code and the displays embodied in that code, ultimately recreating those as "Copilot."

52.     Ahmed's use of True Footage products reflects not use in support conducting legitimate property appraisals, but rather Defendants' effort to copy and take for themselves the innovations and years of development of True Footage's engineers.

53.     The Copilot product contains a rote copy of TrueTracts. The following are a non-exclusive set of examples.

54.     *Heatmap Inputs*: TrueTracts begins with a heatmap to display how comparable nearby properties are. An appraiser can adjust inputs—like gross living area (GLA), lot size, or the number of bedrooms—with filters displayed on grey and blue column charts. TrueTracts automatically calculates each input's distribution of values within the subject submarket and places a red X showing where the subject property lies in the distribution. TrueTracts has implemented these filters in a sophisticated display.

FENWICK & WEST LLP

COMPLAINT                                11                                CASE NO.

*True Footage TrueTracts Heatmap Input Filters Page*



*Automax Copilot Heatmap Input Filters Page*



55.    As shown in these screenshots, Copilot duplicated TrueTracts's filters.  Copilot also begins with a heatmap using adjustable inputs—like GLA, lot size, or the number of bedrooms—with filters displayed on grey and blue column charts.  Copilot even uses the same red X to show the subject property on the distribution.  Copilot took the design and presentation of this information from TrueTracts.

FENWICK & WEST LLP

56.     *Market Identification*: Once an appraiser completes the input filters, TrueTracts populates the heatmap to help identify comparable properties.  Identifying properties with equally valuable locations is one of the most challenging steps in a real estate appraisal.  TrueTracts estimates the value of nearby properties, controlling for each property's features, to show which properties have a similarly valuable location.  TrueTracts color-codes each property to show the degree of similarity to the subject property: dark green for properties whose location value is highly similar (less than a 3% estimated difference), light green for moderately similar properties (within 3% to 6% estimated difference), blue for properties in a worse location (more than 6% lower value), and red for properties in a better location (more than 6% higher value).  True Footage designed each of these elements to help the appraiser easily and accurately pick comparable properties and curate a set of data—the foundation for a successful appraisal.

*True Footage TrueTracts Copilot Market Identification Legend*



*Automax Copilot Market Identification Legend*



COMPLAINT                                          13                                          CASE NO.

57.     As shown above, Copilot copied the design of TrueTracts's first-of-its-kind heatmap.  Not only did Copilot copy TrueTracts's feature that generates a heatmap to identify similar markets, Copilot also copied each of TrueTracts's categories and the colors for those categories—i.e., Defendants lazily copied all the constituent selection, organization, and visual design choices of the feature.

58.     *Adjustments*: After identifying comparable properties, an appraiser can use TrueTracts to estimate and adjust the value of a property's features in the market.  TrueTracts is the first appraisal tool on the market to estimate adjustments using a method known as a generalized additive model (GAM).  Before True Footage, appraisers often calculated the value of a feature in a property using paired sales—i.e., by identifying comparable properties that differed only with respect to whether they had the feature in question.  TrueTracts revolutionized the process by using a GAM.  The GAM in TrueTracts estimates the value of a feature using nonlinear relationships derived from larger data sets and allows an appraiser to cross reference many more data points.  This yields a much more accurate prediction of feature value and a more robust appraisal overall.

59.     TrueTracts graphs the quantities and corresponding values of that feature across many properties, with a trend line showing the relationship between features and sales price.  TrueTracts also calculates a value for the feature and a level of uncertainty around that estimate, called a "credible interval."

*True Footage TrueTracts Adjustment Estimates Page*



*Automax Copilot Adjustment Estimates Page*



60.    Copilot copied TrueTracts's method and presentation of its adjustment tool.  Like TrueTracts, Copilot uses a GAM, estimates the value of the feature, and places an uncertainty interval around that estimate.  Copilot even copied the bulleted commentary describing the graph verbatim from TrueTracts.  Defendant Ahmed even referred to TrueTracts by name in a public webinar and admitted that Copilot uses the same approach, informing the webinar audience: "If any of you have ever used TrueTracts before, then you'll be familiar with GAM already and the math behind how the adjustments are calculated."[10]

61.    *Reconciliation*: TrueTracts ends its appraisal workflow with a reconciliation dashboard showing the subject property's final range of values supported by the data and the most similar properties informing that valuation.  TrueTracts includes a roughly page-long description of its innovative reconciliation methodology.

---

[10] "Copilot to the future - UAD 3.6 in minutes," StoryBoard EMP, https://www.bigmarker.com/Storyboard-EMP/copilot-to-the-future-uad-3-6-appraisals-in-minutes, at 36:25.

COMPLAINT                                        15                                        CASE NO.

*True Footage TrueTracts Reconciliation Methodology Page*

**Reconciliation Dashboard**

| | | | | | | |
|---|---|---|---|---|---|---|
| 624 N Merrill St | 6/10 | 30.0% | ✕ | $1,107,700 | = | $332,310 |
| 210 Wisner St | 8/10 | 40.0% | ✕ | $1,362,400 | = | $544,960 |

**Methodology**

Data driven approach to reconciliation:

The primary objective of a real estate appraisal is to develop an opinion of market value, defined, in part, as the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale.

This reconciliation process leverages advanced statistical methods to arrive at that most probable price in a rigorous, data-driven manner, enhancing the credibility and transparency of the appraiser's professional judgment.

The process begins with the adjusted sale prices of the selected comparable properties. Each comparable sale is assigned a rating on a scale of 1 to 10 based on its similarity to the subject property, which in turn informs a weighted average calculation. This weighted average serves as the initial point estimate of value and represents the statistically strongest estimate of market value, based solely on the quantifiable data derived from the selected comparables.

However, appraising a property to a single point value is inherently uncertain because real estate markets are full of variability. For instance, one home might sell higher due to superior marketing, while another fetches less because the seller was eager to close quickly and didn't negotiate aggressively. Even with solid adjustments to comparable sales, these unpredictable factors create a range of possible values, making any one number an imperfect estimate at best.

To quantify this uncertainty, we use a relative likelihood distribution derived from the adjusted prices and similarity ratings of the comparable sales.[1] This distribution shows how the likelihood of different values compares to that of the weighted average (i.e., the best-supported value). We then define the Supported Value Range to consist of all values whose likelihood is at least 50% of that of the weighted average.[2] This approach ensures that the range is grounded in data and reflects realistic bounds for the true market value.

The appraiser then reconciles the final value conclusion within this Supported Value Range by considering three key types of evidence:

- Qualitative factors: The appraiser's professional judgment on qualitative elements that extend beyond quantifiable adjustments, such as property-specific features (e.g., the openness of the floor plan or architectural design) and location-specific nuances (e.g., proximity to amenities). These insights ensure a holistic reconciliation that captures real-world dynamics that are difficult to adjust for.

- Active listings and pending sales: The most recent market data indicating emerging price trends and buyer/seller dynamics.

- Contract price (for purchase appraisals): Consistent with the definition of market value—the most probable price between informed parties without undue influence—the contract price is a robust indicator of value, reflecting a willing buyer and seller's agreement under typical conditions, assuming both parties are typically motivated, well-informed, and acting prudently without undue stimulus.

By integrating these elements, the appraiser's selection at the upper, middle, or lower end of the Supported Value Range ensures that the final value conclusion is statistically supported and formally incorporates professional expertise.

[1] Specifically, this relative likelihood distribution is a Bayesian posterior t-distribution.

[2] This threshold is supported by statistical literature: Burnham and Anderson (2002) consider values with just 37% of the likelihood of the best-supported value to have "substantial" support from the data. We adopt a more conservative threshold of 50%.

CLOSE    PROCEED TO EXPORT

FENWICK & WEST LLP

COMPLAINT                                    16                                    CASE NO.

FENWICK & WEST LLP

*Automax Copilot Reconciliation Methodology Page*

| | | | | | | |
|---|---|---|---|---|---|---|
| 10102 Rio Hondo Pkwy | 29/100 | 30.1% | ✗ | $939,000 | = | $282,287 |
| 12383 Magnolia St | 35/100 | 36.2% | ✗ | $1,010,000 | = | $365,664 |
| 12437 Denholm Dr | 32/100 | 33.7% | ✗ | $910,000 | = | $306,971 |

**Methodology**

**A Data-Driven Approach to Value Reconciliation**

The fundamental goal of any property appraisal is to establish an opinion of market value—essentially, the most probable price a property would command in an open, competitive market where both buyer and seller are acting reasonably and without pressure.

This reconciliation methodology employs sophisticated statistical techniques to determine that most probable price through a systematic, evidence-based framework. This approach strengthens both the reliability and clarity of the appraiser's professional conclusions.

The analysis starts with the adjusted sale prices from chosen comparable properties. Each comparable receives a rating from 1 to 100 reflecting how closely it mirrors the subject property. These ratings drive a weighted average calculation, which becomes our initial value estimate—the strongest statistical indicator of market value based purely on measurable data from the comparables.

That said, pinpointing a single exact value carries inherent uncertainty. Real estate markets are influenced by countless variables. Perhaps one property sold above expectations due to exceptional staging, while another closed lower because the owner prioritized speed over price. Despite careful adjustments to comparable sales, these unpredictable elements mean any specific figure represents an estimate within a broader spectrum of possibilities.

To address this uncertainty, we construct a relative likelihood distribution using the adjusted prices and similarity ratings.[1] This distribution illustrates how the probability of various values compares to our weighted average (the most strongly supported estimate). The Supported Value Range encompasses all values with at least 50% of the likelihood assigned to the weighted average.[2] This methodology ensures the range remains anchored in actual data while establishing realistic boundaries for true market value.

The appraiser then determines the final value within this Supported Value Range by weighing three categories of evidence:

· **Qualitative considerations:** Professional assessment of elements beyond numerical adjustments—property-specific characteristics like layout flow or architectural style, and location factors such as neighborhood amenities. These observations capture real-world dynamics that resist quantification.

· **Current market activity:** Active listings and pending transactions that reveal emerging price patterns and current buyer-seller dynamics.

· **Contract price (when applicable):** For purchase appraisals, the agreed-upon price between informed parties serves as a meaningful value indicator, reflecting negotiations between motivated participants acting without external pressure.

By synthesizing these factors, the appraiser's positioning within the Supported Value Range—whether toward the upper, middle, or lower end—produces a final conclusion that is both statistically grounded and enriched by professional expertise.

62. Copilot copies TrueTracts's entire description of its methodology with only nominal rephrasing, like:

    (a)   *TrueTracts*: "The primary objective of a real estate appraisal is to develop an opinion of market value, defined, in part, as the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale."

        (i)   *Copilot*: "The fundamental goal of any property appraisal is to establish an opinion of the market value—essentially, the most probable price a property would command in an open, competitive market where both buyer and seller are acting reasonably and without pressure."

    (b)   *TrueTracts*: "Even with solid adjustments to comparable sales, these unpredictable factors create a range of possible values, making any one number an imperfect estimate at best."

COMPLAINT                  17                  CASE NO.

(i)   *Copilot*: "Despite careful adjustments to comparable sales, these unpredictable elements mean any specific figure represents an estimate within a broader spectrum of possibilities."

(c)   *TrueTracts*: "To quantify this uncertainty, we use a relative likelihood distribution derived from the adjusted prices and similarity ratings of comparable sales [Footnote 1]."

(i)   *Copilot*: "To address this uncertainty, we construct a relative likelihood distribution using the adjusted prices and similarity ratings [Footnote 1]."

63.   On information and belief, Defendants copied the description of TrueTracts's methodology into a generative AI tool and asked it to draft the same methodology with light rewording, and the result is virtually identical structure and phrasing in Automax's description of its methodology.

64.   These are not the only examples where Copilot copies TrueTracts. Copilot duplicates each step of TrueTracts's workflow and the selection and arrangement of information and visual elements within each step. Copilot copies additional written descriptions from TrueTracts. Copilot copies additional design choices from TrueTracts. Copilot copies the entire appraisal development sequence from TrueTracts. True Footage spent years developing a proprietary tool to marshal all the data for an accurate appraisal, and Defendants spent only months copying True Footage's creation. In sum, Copilot is a "vibe coded" knock-off of TrueTracts.

65.   Using the materials obtained through their account access to True Footage, TrueTracts, and Spark, Defendants copied, adapted, and re-created these expressive elements of TrueTracts—including specific interface layouts, comparative-market displays, textual commentary, and graphic design choices—in Copilot.

66.   Copilot incorporates the same or substantially similar arrangement of information, color schemes, heatmap displays, adjustment pages, and textual explanations that True Footage developed in TrueTracts. These similarities are the result of Defendants' direct copying and adaptation of protected expression, not independent creation.

FENWICK & WEST LLP

**Ahmed And Automax launch their illicit copy and advertise it in public webinars.**

67.    Defendants launched Copilot to users through the website *copilot.automax.ai*. A user must log in to Copilot at that website and select which pages of Copilot's workflow to display by interacting with Copilot.

68.    Automax makes money selling appraisals to lenders and other institutions. Ahmed has stated that Automax sells appraisals to "some of the largest lenders in the country."[11]

69.    On information and belief, Automax's own staff employees or contractors fulfill most of these appraisal orders. Additionally, when Automax gets an appraisal order for a property located in an area where Automax does not have an appraiser on staff, Automax turns to other licensed appraisers—independent Copilot users who sign up to receive appraisal requests from Automax. Automax's staff and these panel appraisers complete these appraisals using Copilot on Automax's website.

70.    Automax also makes money from independent appraisers. Automax charges non-panel appraisers $30 per appraisal to use Copilot. In selling to lenders and to appraisers, Automax's revenue streams mirrored True Footage's business model.

71.    On information and belief, True Footage has lost subscriptions from appraisers who chose to use Automax's infringing Copilot product instead of TrueTracts, and lost appraisal orders from lenders who placed orders with Automax, to be fulfilled using Copilot.

72.    Defendants have advertised and demonstrated Copilot to the public in webinars.[12] In these webinars, Ahmed displayed Copilot's copy of TrueTracts and interacted with it live on screen. In one of those webinars, Ahmed not only likened Copilot to TrueTracts by name but demonstrated Copilot appraisals on 10117 Rio Hondo Parkway and 574 Chenery Street properties—two of the properties that Defendants used for TrueTracts sessions. Defendants used their work on these properties in TrueTracts to build Copilot, ensuring that Copilot mirrored TrueTracts's interface and operation.

---

[11] "Copilot to the future - UAD 3.6 in minutes," StoryBoard EMP, https://www.bigmarker.com/Storyboard-EMP/copilot-to-the-future-uad-3-6-appraisals-in-minutes.
[12] *Id*.; "Tech-Driven Appraisals: Faster, More Transparent — Automax AI," AVSociety, https://www.youtube.com/watch?v=34NmyQHwVY4.

FENWICK & WEST LLP

73.     After True Footage learned about Automax and Copilot, True Footage sent Defendants a letter on March 27, 2026 demanding that they immediately cease and desist their illegal copying.  True Footage informed Defendants of True Footage's copyright protections and terms of service, identified in detail the evidence of unlawful copying described above, and demanded among other things that Defendants:

- "immediately stop operating, distributing, and advertising" Automax's appraisal products;

- "turn over all source code and documentation associated with those products to True Footage for destruction"; and

- "begin development under appropriate clean room protocols and without infringing any rights of True Footage or accessing TrueTracts" if Automax intends to continue participating in the appraisal software market going forward.

74.     Rather than comply, Ahmed responded that he assumed True Footage would hold all action in abeyance while he assembled his defense.  But the next day, with no regard to True Footage's evidence that Copilot is an unlawful copy and using it infringes on True Footage's rights, Ahmed presented Copilot to a crowd of appraisers at another sales webinar.  True Footage had no alternative to protect its rights than filing this complaint.

75.     To date, despite no fewer than *five* separate requests to confirm that Defendants have preserved and not altered or destroyed documents evidencing the actions alleged herein, Defendants have deflected and not provided the requested confirmations, providing a strong indication that Ahmed or others at Automax have tampered with or destroyed evidence relating to their wrongful acts.

### COUNT I: FRAUD

### (Against Ahmed)

76.     True Footage incorporates each of the allegations in the preceding paragraphs here.

77.     Ahmed made material misrepresentations to True Footage knowing them to be false and with the intent to induce True Footage to act in reliance upon them.

78.     Ahmed's misrepresentations included, among other things, false statements

FENWICK & WEST LLP

regarding his professional status, licensing, and intended use of True Footage's products including TrueTracts and Spark. Ahmed affirmatively represented that he was a licensed appraiser and an active member of multiple MLS organizations within the San Francisco Bay Area: MLSListings, Bareis MLS, Bareis Plus, bridgeMLS, Bay East Association of Realtors, and San Francisco MLS. Ahmed's misrepresentations also include his undisclosed intent to copy and exploit TrueTracts for his own and Automax's commercial benefit.

79.    Ahmed made these misrepresentations to True Footage in connection with his registration for a True Footage account on or about October 29, 2025, and his agreements to the TrueTracts and Spark Terms of Service on or about October 30, 2025. Ahmed's subsequent conduct was also intended to disguise his and Automax's true purpose, including using 18 property sessions not to conduct appraisals for a pending real estate transaction, but as part of an effort to copy TrueTracts.

80.    At the time of these misrepresentations, Ahmed knew they were false or made them with reckless disregard for their truth.

81.    True Footage reasonably and justifiably relied on Ahmed's representations in granting Ahmed access to TrueTracts, Spark, and other of True Footage's intellectual property, proprietary appraisal products, and data.

82.    As a direct and proximate result of Ahmed's fraudulent conduct, True Footage has suffered and continues to suffer substantial harm, including, but not limited to, loss of proprietary information, diminished goodwill, disruption of its business relationships, and damages in an amount to be proven at trial.

**COUNT II: NEGLIGENT MISREPRESENTATION**

**(Against Ahmed)**

83.    True Footage incorporates each of the allegations in the preceding paragraphs here.

84.    Ahmed made material misrepresentations to True Footage, including false statements regarding his professional status, licensing, and intended use of True Footage's products including TrueTracts and Spark. Ahmed represented that he was a licensed appraiser and an active member of multiple MLS organizations within the San Francisco Bay Area: MLSListings, Bareis

MLS, Bareis Plus, bridgeMLS, Bay East Association of Realtors, and San Francisco MLS. Ahmed's misrepresentations also include his undisclosed intent to copy and exploit TrueTracts for his own and Automax's commercial benefit.

85.    Ahmed made these misrepresentations to True Footage in connection with his registration for a True Footage account on or about October 29, 2025, and his agreements to the TrueTracts and Spark Terms of Service on or about October 30, 2025.

86.    At the time of these misrepresentations, Ahmed had no reasonable grounds for believing they were true.

87.    Ahmed intended that True Footage rely on his misrepresentations in granting him access to TrueTracts, Spark, and other of True Footage's intellectual property, proprietary appraisal products, and data.

88.    True Footage reasonably and justifiably relied on Ahmed's representations in granting Ahmed access to TrueTracts, Spark, and other of True Footage's intellectual property, proprietary appraisal products, and data.

89.    True Footage has suffered and continues to suffer harm, including, but not limited to, loss of proprietary information, diminished goodwill, disruption of its business relationships, and damages in an amount to be proven at trial.

90.    True Footage's reliance on Ahmed's misrepresentations was a substantial factor in causing True Footage's harm.

## COUNT III: BREACH OF CONTRACT

### (Against Ahmed)

91.    True Footage incorporates each of the allegations in the preceding paragraphs here.

92.    Ahmed entered into the TrueTracts Terms of Service and the Spark Terms of Service through separate sign-ups, both on October 30, 2025.

93.    Each Product Terms of Service constitutes a valid contract between Defendant Humza Ahmed and True Footage.

94.    True Footage fulfilled all duties it owes under each Product Terms of Service and has not breached the Product Terms of Service.

FENWICK & WEST LLP

95.    Ahmed breached the Product Terms of Service.  For example:

(a)    Ahmed agreed to use his account only as an individual and not to share the account.  He materially breached the Product Terms of Service by using his account on behalf of Automax and sharing his account with other Automax employees.

(b)    Ahmed agreed to register his account with accurate information.  He materially breached the Product Terms of Service by stating falsely that he is an active member in six MLS services in the San Francisco Bay Area: MLSListings, Bareis MLS, Bareis Plus, bridgeMLS, Bay East Association of Realtors, and San Francisco MLS.

(c)    Ahmed agreed to use TrueTracts and Spark "solely for its intended purpose as a tool for appraisers" and not for any unlawful purpose.  He materially breached the Product Terms of Service by copying TrueTracts and using Spark to create Copilot on behalf of Automax.

(d)    Ahmed agreed to use True Footage's intellectual property in TrueTracts and Spark solely for his own internal business purposes.  He materially breached the Product Terms of Service by unlawfully taking True Footage's intellectual property to create a direct copy in Copilot.

96.    As a direct and proximate result of Ahmed's breaches, True Footage has been damaged, and continues to suffer damage, including lost license revenue, lost appraisal orders, and operational costs, in an amount to be determined at trial.

**COUNT IV: INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

**(Against Ahmed and Automax)**

97.    True Footage incorporates each of the allegations in the preceding paragraphs here.

98.    True Footage had existing contracts with certain users under the binding Product Terms of Service.

99.    After Ahmed created an account with True Footage and agreed to the Product Terms of Service, Defendants were aware of the obligations imposed on other True Footage users.

COMPLAINT                                    23                                    CASE NO.

100. Despite that knowledge, Defendants intentionally interfered with the performance of these contracts knowing that their conduct was certain or substantially certain to disrupt those contractual obligations. Knowing that True Footage's users were bound by contractual obligations including terms prohibiting account sharing and access for third parties, Defendants nevertheless instructed these users to open TrueTracts sessions and use Spark integrations for the same properties that Defendants were analyzing, and relay that information to Defendants for use in Automax products.

101. True Footage's internal database records show that users created new sessions for identical property addresses within days of corresponding sessions created by Defendants. Those users then uploaded MLS data and transmitted the resulting session links to Defendants, enabling Defendants to access TrueTracts features and use Spark integrations they could not view or use on their own.

102. Defendants' acts directly disrupted performance of True Footage's contracts with its users under the Product Terms of Service, which require that each user maintains sole use of their own account credentials, among other provisions.

103. Defendants' conduct caused repeated breaches and impaired True Footage's contractual rights and goodwill with its professional appraiser users.

104. As a direct and proximate result of Defendants' interference with these contracts, True Footage has suffered damages and continues to suffer damage, including lost license revenue, lost appraisal orders, and operational costs, in an amount to be determined at trial.

## COUNT V: INDUCING BREACH OF CONTRACT

### (Against Ahmed and Automax)

105. True Footage incorporates each of the allegations in the preceding paragraphs here.

106. True Footage had existing contracts with certain users under the binding Product Terms of Service.

107. After Ahmed created an account with True Footage and agreed to the Product Terms of Service, Defendants were aware of the obligations imposed on other True Footage users. Defendants knew that the Product Terms of Service bar users from sharing credentials or using

FENWICK & WEST LLP

their accounts on behalf of others.

108.    Despite that knowledge, Defendants acted with the intent that certain users would breach their contractual duties to True Footage and Defendants took action that did, in fact, cause certain of those users to breach their agreements with True Footage.

109.    Defendants' inducement was a substantial factor in causing each breach.  Because Defendants lacked the MLS credentials necessary to access certain TrueTracts features and Spark integrations, they depended on cooperating True Footage users to do so on their behalf.  Defendants approached certain True Footage users, including at least one operating in this District, and requested that they create TrueTracts sessions and use Spark integrations for properties designated by Defendants and then share the resulting session links.

110.    At Defendants' request, those users created sessions in TrueTracts for the same property addresses, uploaded MLS data through their accounts using the Spark integration, and transmitted the resulting session links to Defendants. Each of those actions, performed at Defendants' direction, violated the Product Terms of Service and constituted a breach.

111.    Without the cooperation of these True Footage users, Defendants could not have accessed certain TrueTracts features that require a user to upload MLS data through the Spark integration.  By obtaining and using those shared session links, Defendants secured unauthorized access that directly resulted from the breaches they induced, and Defendants derived commercial benefit from that misconduct when they incorporated TrueTracts elements into the Automax Copilot product.

112.    As a direct and proximate result of Defendants' interference with these contracts, True Footage has suffered damages and continues to suffer damage, including lost license revenue, lost appraisal orders, and operational costs, in an amount to be determined at trial.

## COUNT VI: DIRECT COPYRIGHT INFRINGEMENT

### (Against Ahmed and Automax)

113.    True Footage incorporates each of the allegations in the preceding paragraphs here.

114.    True Footage created the computer code that presents the front-end user interface of TrueTracts (the "TrueTracts Code"), including the expressive elements in the screen displays

COMPLAINT                                              25                                              CASE NO.

generated by the execution of that code. The TrueTracts Code is an original work fixed in a tangible medium of expression.

115. True Footage owns the valid and enforceable Copyright Registration TX 9-585-370 of the TrueTracts Code, registered with the U.S. Copyright Office before instituting this action. True Footage therefore holds the exclusive rights to reproduce, display publicly, perform publicly, and create derivative works of the TrueTracts Code.

116. Defendants infringed True Footage's exclusive rights in the TrueTracts Code in separate and independent ways.

117. On information and belief, Defendants reproduced the TrueTracts Code when ingesting it into one or more LLMs or other generative AI tools for Defendants' own analysis and manipulation. True Footage did not authorize Defendants' reproduction, and Defendants violated True Footage's exclusive reproduction right in the TrueTracts Code.

118. The outputs that Defendants created with a generative AI tool after ingesting the TrueTracts Code are derivative works of the TrueTracts Code. True Footage did not authorize Defendants' creation of these derivative works, and Defendants violated True Footage's exclusive right to create derivative works of the TrueTracts Code.

119. Defendants' Copilot product is a derivative work of the TrueTracts Code. True Footage did not authorize Defendants' creation of this derivative work, and Defendants violated True Footage's exclusive right to create derivative works of the TrueTracts Code.

120. Defendants reproduced the TrueTracts Code in their computers' memory when accessing Copilot via *copilot.automax.ai*. True Footage did not authorize Defendants' reproduction and Defendants violated True Footage's exclusive reproduction right in the TrueTracts Code.

121. Defendants publicly displayed and publicly performed the TrueTracts Code on their computer screens when hosting webinars advertising Copilot and sharing the computer screen to demonstrate Copilot's functions. True Footage did not authorize Defendants' public display or public performance, and Defendants have violated, and continue to violate, True Footage's exclusive right to publicly perform and publicly display the TrueTracts Code.

122. Automax publicly displayed and publicly performed the TrueTracts Code on

FENWICK & WEST LLP

Copilot users' computer screens when users used Copilot at *copilot.automax.ai*. True Footage did not authorize Automax's public display or public performance, and Defendants have violated, and continue to violate, True Footage's exclusive right to publicly perform and publicly display the TrueTracts Code.

123. Defendants gained access to the TrueTracts Code through Ahmed's fraudulent and unlawful creation of True Footage and TrueTracts accounts.

124. Defendants' infringement of True Footage's copyrights in the TrueTracts Code has been deliberate, willful, and in utter disregard of True Footage's rights.

125. As a direct and proximate result of Defendants' direct copyright infringement, True Footage has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. True Footage is entitled to recover from Defendants in amounts to be determined at trial, the damages it has sustained and will sustain, and any gains, profits, and advantages obtained by Defendants through their reproduction, display, and/or performance of the TrueTracts Code. The amount of such damages, gains, profits, and advantages cannot be fully determined by True Footage but will be established according to proof at trial.

126. As a direct and proximate result of Defendants' direct copyright infringement, True Footage has suffered, and will continue to suffer, irreparable harm to its business, reputation, and goodwill. Defendants will continue to reproduce, display, and/or perform the TrueTracts Code unless the Court issues an injunction preventing further infringement.

## COUNT VII: CONTRIBUTORY COPYRIGHT INFRINGEMENT

### (Against Automax)

127. True Footage incorporates each of the allegations in the preceding paragraphs here.

128. Each Copilot user reproduces the TrueTracts Code in his or her computer's memory when accessing Copilot via *copilot.automax.ai*. True Footage did not authorize each Copilot user's reproduction, and each Copilot user has violated, and continues to violate, True Footage's exclusive reproduction right in the TrueTracts Code.

129. When Defendants accessed and used the TrueTracts Code to create Copilot, Automax knew that True Footage owns the copyrights in the TrueTracts Code and that Copilot is

an infringing copy of TrueTracts.  When Automax launched Copilot, Automax knew and intended that each Copilot user's use of Copilot via the website *copilot.automax.ai* directly infringed, and continues to directly infringe, True Footage's copyrights in the TrueTracts Code.

130.    In a cease-and-desist letter on March 27, 2026, True Footage further notified Automax of True Footage's copyrights in the TrueTracts Code and that True Footage did not authorize Copilot's use of the TrueTracts Code.  Automax did not cease and desist operation of Copilot after March 27, 2026.  After that, Automax knew that each Copilot user's use of Copilot via the website *copilot.automax.ai* directly infringed, and continues to directly infringe, True Footage's copyrights in the TrueTracts Code.

131.    Automax can take simple measures to stop infringement caused by each Copilot user's use of Copilot.  Automax has the authority to cease distribution of Copilot via its *copilot.automax.ai* website, cease all support for Copilot, stop accepting requests for appraisals that users fulfill with Copilot, and order destruction of backup copies of Copilot on the servers that distribute Copilot.  Automax has not taken those steps, nor has it otherwise moved to cease the infringement caused by Copilot.

132.    Automax realized, and continues to realize, unjust profits, gains, and advantages as a proximate result of their contributory infringement as long as such contributory infringement is permitted to continue.  Automax earns revenue by fulfilling requests for appraisals with appraisers who use Copilot and infringe on True Footage's copyrights in the TrueTracts Code.

133.    As a direct and proximate result of Automax's contributory copyright infringement, True Footage has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill.  True Footage is entitled to recover from Automax in amounts to be determined at trial, the damages it has sustained and will sustain, and any gains, profits, and advantages obtained by Automax either through its acts of contributory infringement or through its reproduction, display, and/or performance of the TrueTracts Code.  The amount of such damages, gains, profits, and advantages cannot be fully determined by True Footage but will be established according to proof at trial.

134.    As a direct and proximate result of Automax's contributory copyright infringement, True Footage has suffered, and will continue to suffer, irreparable harm to its business, reputation, and goodwill.  Automax will continue to contribute to and benefit from Copilot user's ongoing reproduction of the TrueTracts Code unless the Court issues an injunction preventing further infringement.

## COUNT VIII: VICARIOUS COPYRIGHT INFRINGEMENT

### (Against Automax)

135.    True Footage incorporates each of the allegations in the preceding paragraphs here.

136.    Automax sold, and continues to sell, appraisals completed by appraisers on the Automax staff and by Automax's appraisal panel.  Each staff and panel appraiser reproduces the TrueTracts Code in his or her computer's memory when accessing Copilot via copilot.automax.ai.  True Footage did not authorize each Copilot user's reproduction, and each Copilot user has violated, and continues to violate, True Footage's exclusive reproduction right in the TrueTracts Code.

137.    Automax receives a direct financial benefit from each staff and panel appraiser's infringement.  Automax sells the appraisal completed with the infringing Copilot product to mortgage lenders and other institutions.

138.    Automax has the right and ability to supervise and control each staff and panel appraiser.  Automax provides each staff and panel appraiser with appraisal orders and instructions on how to complete the appraisals.  Further, Automax exercises supervision and control over its employees through its employer-employee relationship, and when Automax employees complete infringing appraisals, they do so within the scope of their employment as appraisers and in furtherance of Automax's appraisal business.  On information and belief, for each staff and panel appraiser that is not an Automax employee, Automax has the contractual right and ability to supervise and control these appraisers through their agreements to complete appraisals for Automax.

139.    Automax failed to exercise its supervision and control so that each of these appraisers did not commit copyright infringement.  In fact, Automax directed these appraisers to

COMPLAINT                                        29                                        CASE NO.

FENWICK & WEST LLP

use Copilot and infringe on True Footage's rights.

140.    Automax realized, and continues to realize, unjust profits, gains, and advantages as a proximate result of its vicarious infringement as long as such vicarious infringement is permitted to continue.

141.    As a direct and proximate result of Automax's vicarious copyright infringement, True Footage has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill.  True Footage is entitled to recover from Automax in amounts to be determined at trial, the damages it has sustained and will sustain, and any gains, profits, and advantages obtained by Automax either through its acts of vicarious infringement or through its reproduction, display, and/or performance of the TrueTracts Code.  The amount of such damages, gains, profits, and advantages cannot be fully determined by True Footage but will be established according to proof at trial.

142.    As a direct and proximate result of Automax's vicarious copyright infringement, True Footage has suffered, and will continue to suffer, irreparable harm to its business, reputation, and goodwill.  Automax will continue to supervise and benefit from staff and panel appraisers' ongoing reproduction of the TrueTracts Code unless the Court issues an injunction preventing further infringement.

## REQUEST FOR RELIEF

Plaintiff True Footage respectfully requests judgment in its favor and against Defendants, and for the Court to grant the following relief:

a.    That the Court enter an injunction prohibiting Defendants, and all persons acting in concert with them, from:

   i.    Infringing the True Footage copyrights;

   ii.    Retaining, using, distributing, displaying, reproducing, marketing, advertising, or performing the TrueTracts Code or any materials derived from the TrueTracts Code, including Copilot, or participating or assisting in any of those activities; and

   iii.    Engaging in any other acts that violate the Copyright Act;

COMPLAINT                                      30                                      CASE NO.

b. That the Court enter a mandatory injunction requiring Defendants to destroy all copies of Copilot and the TrueTracts Code in their possession, custody, or control, and that any future version of Copilot must be developed according to industry standard "clean room" procedures that prevent use of code or other materials obtained from Defendants' unlawful access to True Footage products;

c. That the Court grant True Footage its actual damages caused by Defendants' unlawful acts, including, but not limited to, damages for fraud, negligent misrepresentation, breach of contract, intentional interference with contractual relations, inducing breach of contract, direct copyright infringement, contributory copyright infringement, and vicarious copyright infringement;

d. That the Court disgorge Automax's profits, together with a full and complete accounting of all revenues, expenses, and other amounts derived from its creation and operation of Copilot;

e. In the alternative, that the Court award True Footage statutory damages for willful copyright infringement;

f. That the Court award True Footage its reasonable attorneys' fees and costs;

g. That the Court award True Footage prejudgment and post-judgment interest; and

h. That the Court award True Footage such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

True Footage demands a trial by jury on all issues so triable.

Dated: April 22, 2026

Respectfully submitted,

FENWICK & WEST LLP

By:  /s/ Todd R. Gregorian
Todd R. Gregorian
Garner Kropp
Gregory Adams

*Attorneys for Plaintiff*
*True Footage Inc.*